UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KEVIN BRIAN MITCHELL,

        Plaintiff,

  v.                                            Case No. 17-C-920

ANDREW MOUNGEY, et al.,

        Defendants.

---

## DECISION AND ORDER

Plaintiff Kevin Brian Mitchell, who is currently serving a state prison sentence at Waupun Correctional Institution and representing himself, filed this action pursuant to 42 U.S.C. § 1983, alleging that his civil rights were violated. In particular, he asserts defendants Andrew Moungey, Matthew Burns, Tracey Kappell, and Doyal Johnson used excessive force and Nurse Jennifer Kacyon was deliberately indifferent to his medical needs. Defendants Burns, Kappell, Johnson, and Kacyon filed a motion for summary judgment and Defendant Moungey filed a motion for partial summary judgment on July 9, 2018. Rather than file a response to the defendants' motions, Mitchell filed his own motion for summary judgment. The motions are now ripe for disposition. For the following reasons, the defendants' motions will be granted and Mitchell's motion will be denied.

## BACKGROUND

At all times relevant to this case, Mitchell has been incarcerated at Waupun Correctional Institution. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 54. On April 10, 2017, at approximately 3:50 p.m., Officer Burns received a radio call about an inmate fight near the south underpass. When he arrived at the underpass, he noticed Officer Meagher had placed Mitchell and

inmate Jermaine Hampton in handcuffs. During the investigation into the fight, officers were to place Mitchell in temporary lockup status in the restricted housing unit (RHU).

Officers Moungey and Burns escorted Mitchell from the south underpass to RHU. Moungey walked next to Mitchell, using an escort hold on his left arm, and Burns followed behind. Moungey and Burns directed Mitchell to face forward during the escort and informed Mitchell, consistent with the Principles of Subject Control (POSC) they had been taught, that turning his head toward staff was perceived as a threat. According to the POSC, an inmate's turning to face a guard, a so-called "target glance," is considered a pre-attack posture from which the inmate can easily administer a head-butt or other attack. To minimize the risk of violence or injury, inmates are directed to face away when in close proximity to guards. Despite these warnings, Mitchell turned again and faced Moungey. Burns then stepped alongside Mitchell and pointed forward, directing him to face in that direction. Mitchell ignored Burns' directives and looked in Burns' direction. As a result of Mitchell's failure to follow repeated directions to face forward, Moungey directed Mitchell to the ground. Burns requested that the RHU sergeant send additional staff and leg restraints to their location.

Mitchell contends that he asked Moungey what his name was. When Mitchell did not hear Moungey's response, he asked again. Mitchell claims that, without any warning or provocation, Moungey grabbed him with both hands, picked him up, and slammed him "extremely hard" onto the concrete floor, causing excruciating pain in Mitchell's head and shoulder. Moungey then rolled Mitchell onto his back and began smashing Mitchell's head into the floor. Mitchell asserts Moungey continued to ground his head into the floor for approximately three minutes before other staff members arrived and placed him in handcuffs and leg restraints. Pl.'s Proposed Findings of Fact ¶ 4,

2

ECF No. 66. The defendants dispute that Moungey slammed Mitchell down or smashed his head into the floor.

Once leg restraints were applied and double locked, Moungey and Kappell escorted Mitchell to strip search cell #3 in RHU. Captain Tritt and Burns both offered Mitchell an opportunity to conduct his own strip search at the RHU entrance, but Mitchell refused these multiple offers to conduct his own strip search. Burns then made the decision to conduct a staff-assisted strip search and requested a video camera to document the search. Officer Krause retrieved a handheld camera and recorded the strip search.

The video shows Burns explaining that the officers are with Mitchell, who was just involved in a fight, and during his escort to RHU, Mitchell gave target glances to Moungey and Burns and was decentralized to the ground. Burns indicated leg restraints were applied and Mitchell refused to comply with a strip search once he was escorted to RHU. Burns then introduced Officer Detert as the officer tasked with conducting the strip search. Moungey and Johnson held Mitchell in a compression hold and positioned Mitchell to face the cell door during the staff-assisted strip search. Detert steps up to Mitchell and explains that he will conduct a staff-assisted strip search and will start by cutting off Mitchell's t-shirt. At that point, Mitchell indicated he would remove his t-shirt himself. Moungey explained that because Mitchell failed to comply with two separate directives to remove his shirt, Detert would assist him in removing it. While Detert cuts off the t-shirt, Moungey and Johnson are on each side of Mitchell, securing his elbows and wrists and placing one leg alongside Mitchell's leg to prevent him from kicking. Once Detert removed Mitchell's t-shirt, he advised Mitchell that he would remove his pants. Detert began cutting Mitchell's pants, and Mitchell began glancing toward staff. Burns directed Mitchell to face the wall on three separate

3

occasions. After Detert removed Mitchell's pants, he indicated he would remove Mitchell's underwear. Burns grabbed a towel to cover Mitchell's waist area after the strip search for his privacy.

Next, Detert directed Mitchell to kneel so he could remove Mitchell's socks and boots. Mitchell refused to kneel and asked staff to back up from the gate. Staff backed up, allowing Mitchell enough room to kneel. Burns gave Mitchell repeated directives to kneel. Mitchell responded that he could not kneel and claimed something was squeezing his handcuffs. Burns examined the handcuffs and tether on Mitchell's right arm and found no indication that the restraints prevented Mitchell from kneeling. Burns directed Mitchell to kneel again and advised Mitchell that he had the X-26P Taser. Mitchell claimed that something on his right wrist was too tight and prevented him from going down. Burns looked at the right wrist and advised Mitchell that there was nothing on his wrist that prevented him from kneeling. Moungey and Johnson applied a compliance hold, resulting in more pressure to the wrist. Mitchell continued to refuse to kneel. Burns directed Mitchell to kneel and placed the X-26P Taser onto his right shoulder as an indicator that Burns would use the taser if Mitchell did not comply. Burns gave a final direction to kneel and then administered the taser for three seconds. The use of the taser caused Mitchell to kneel, and staff assisted Mitchell to the ground safely.

Mitchell again targeted glances at staff, and an officer directed him to look at the wall. Kappell stood behind Mitchell and secured Mitchell's head using a trained technique that prevents the inmate from head-butting staff or injuring himself. Burns advised Detert to continue with the search by removing Mitchell's shoes. Detert announced that he was removing Mitchell's right shoe and sock. Burns requested a still camera to photograph the taser mark on Mitchell's shoulder.

4

Detert then announced he was removing Mitchell's left shoe and sock. Detert checked between Mitchell's toes and directed Mitchell to stand. Mitchell complied. Kappell continued to secure Mitchell's head. Detert then conducted the staff-assisted strip search. The search yielded no contraband. Detert placed a privacy towel around Mitchell's waist. Burns took a picture of the mark on Mitchell's shoulder.

At approximately 4:05 p.m., Nurse Kacyon arrived on unit. Burns advised Mitchell that Kacyon had arrived and that he should tell her if he had any injuries. Kaycon observed Mitchell standing, cuffed with his back to her while he faced the strip cell door. Kacyon introduced herself to Mitchell and placed her left hand on his right shoulder in the area where the taser had been applied. Kacyon examined the taser mark on his shoulder and did not observe blood or swelling. She asked Mitchell if he had any injuries he wanted her to examine. Mitchell complained of back, wrist, and bilateral shoulder pain. Kacyon did not observe any swelling or deformity to his shoulders. She could not visualize his wrists due to the restraints. Based on her conversation with Mitchell, Kacyon determined Mitchell was not in any distress at that time. She advised Mitchell and the security staff that she could examine his shoulder at another time when security and safety permitted.

Officers released Mitchell from the tether, and Burns advised Mitchell that he would be escorted backwards. Kappell continued to secure Mitchell's head as staff walked him backwards to his cell. Once Mitchell was placed in his cell, Kappell released her hold.

On April 10, 2017, Mitchell submitted a health services request complaining of shoulder and wrist pain from being handcuffed for several hours. Health services unit staff saw Mitchell on April

5

13, 2017. Nurse Larson ordered ice, acetaminophen, muscle rub, and exercise. She scheduled Mitchell for a follow-up appointment for the next week.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "[A] factual dispute is 'genuine' for summary judgment purposes only when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where a video recording exists, and "[t]here are no allegations or indications that this

6

videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Id.* at 378–81. Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

**A. Excessive Force**

"The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the 'unnecessary and wanton infliction of pain' on prisoners." *Outlaw*, 259 F.3d at 837 (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). Not every "malevolent touch by a prison guard" violates the Eighth Amendment. *Hudson*, 503 U.S. at 9. "The use of *de minimis* force, so long as it 'is not a sort repugnant to the conscience of mankind,' is not of Eighth Amendment concern." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (quoting *Hudson*, 503 U.S. at 9–10). When the force is more than *de minimis*, however, the primary inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *See Hudson*, 503 U.S. at 6. In answering this question, the court must consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the officials responsible on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitely v. Albers*, 475 U.S. 312, 321 (1986).

7

Mitchell asserts Moungey used excessive force against him when he slammed him into the ground and smashed his face into the floor. The defendants deny that Moungey's conduct was excessive and maintain that Moungey used a reasonable amount of force in directing Mitchell to the ground after Mitchell ignored Burns' directives to face forward during the escort. A dispute of fact therefore exists as to whether the force used was reasonable. Accordingly, Mitchell's request for summary judgment as to his excessive force claim against Moungey must be denied.

Mitchell also argues that Burns, Moungey, Johnson, and Kappell used excessive force during the staff-assisted strip search and final escort to his cell. On the record presented to the court, there is no credible evidence that these defendants acted maliciously and sadistically to cause Mitchell harm. Mitchell contends that during the strip search, Moungey and Johnson used their entire body weight to smash Mitchell into the cell and pinned his legs to the cage so he could not move on his own, and Kappell's "headlock" technique made it difficult for Mitchell to breathe. But the video evidence demonstrates that Johnson and Moungey merely held Mitchell in place during the staff-assisted strip search after Mitchell refused multiple requests to perform his own strip search. Kappell restrained Mitchell's head by placing her hand on his forehead and chin to prevent Mitchell from injuring himself or head-butting the officers while Officer Detert completed the strip search. Johnson, Moungey, and Kappell used reasonable force to maintain discipline, rather than to inflict pain or suffering. Accordingly, summary judgment as to Mitchell's claims of excessive force during the strip search against Johnson, Moungey, and Kappell is warranted.

In addition, Officer Burns' use of the taser was not excessive force. In many circumstances, "compelling compliance with an order is a valid penological justification for use of a taser." *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009). The use of a taser or chemical agent violates the

8

Eighth Amendment if it is used "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto v. Dickey*, 744 F.2d 1260, 1270–71 (7th Cir. 1984). In this case, Burns used one three-second burst of the taser only after Mitchell ignored Burns' repeated commands to kneel down and multiple warnings that noncompliance would result in tasing. Although Mitchell contends that Moungey and Johnson prevented him from moving by pinning his legs to the cage, the video evidence shows that the defendants were not touching his legs and backed up to allow him to kneel. Burns investigated Mitchell's claim that he was physically unable to kneel and determined that nothing prevented Mitchell from complying with his directive. "When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force." *Soto*, 744 F.2d at 1267. Burns' use of the taser was a good faith, reasonable effort to restore discipline, and there is no evidence that the force was applied "maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6. In short, Burns is entitled to summary judgment.

**B. Deliberate Indifference**

Mitchell also contends Nurse Kacyon was deliberately indifferent to his serious medical needs. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (citation omitted). Mitchell asserts that Kacyon was deliberately indifferent because she only conducted a cursory examination of his complaints and did not provide immediate medical treatment for his right shoulder and head pain. Mitchell has not established that Kacyon disregarded an "excessive" risk to his safety. Not

9

every "ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Id.* at 1372. Although Mitchell's shoulder and head pain may have caused some discomfort, there is no indication that Mitchell suffered from a serious medical need for which imminent and emergent medical care was required. Kacyon followed protocol by conducting a brief examination to assess whether Mitchell required emergency medical care. She used her professional medical judgment to conclude that Mitchell did not need immediate medical care and advised him that he could be seen later for his complaints of pain when safety and security permitted further examination. Once Mitchell was in his cell, he filed a health services request, and had an appointment with health services unit staff to address his complaints three days later. The evidence establishes that Kacyon did not disregard Mitchell's medical concerns but rather facilitated his ability to express his concerns to the appropriate personnel through a health services request once she determined his complaints were not emergent. Mitchell's disagreement with Kacyon's conclusion that he did not need emergency medical care does not amount to deliberate indifference. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). Accordingly, Kacyon was not deliberately indifferent to Mitchell's serious medical needs. *See Cirilla v. Kankakee Cty. Jail*, 438 F. Supp. 2d 937, 945–46 (C.D. Ill. 2006) (finding summary judgment in favor of defendants where there was no evidence that plaintiff required immediate medical treatment).

## CONCLUSION

Based on the foregoing, Mitchell's motion for summary judgment (ECF No. 64) is **DENIED** and Burns, Johnson, Kacyon, and Kappell's motion for summary judgment as well as Moungey's motion for partial summary judgment (ECF No. 52) are **GRANTED**. Mitchell's claims against Defendants Matthew Burns, Tracey Kappell, Jennifer Kacyon, and Doyal Johnson are dismissed.

All that remains is Mitchell's claim that Andrew Moungey used excessive force during Mitchell's escort to RHU.  The Clerk is directed to set this matter on the court's calendar for a telephone scheduling conference.

**SO ORDERED** this   17th   day of December, 2018.

             s/ William C. Griesbach
             William C. Griesbach, Chief Judge
             United States District Court